IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re:<br><br>CATHOLIC DIOCESE OF WILMINGTON, INC., a Delaware Corporation,<br><br>Debtor. | ) | Chapter 11<br><br>Case No. 09-13560 (CSS) |
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS,<br><br>Plaintiff,<br><br>v.<br><br>CATHOLIC DIOCESE OF WILMINGTON, INC., a Delaware non-stock Corporation; CATHOLIC DIOCESE FOUNDATION f/k/a THE CATHOLIC FOUNDATION OF THE DIOCESE OF WILMINGTON, INC., a Delaware non-stock Corporation; THE DIOCESE OF WILMINGTON SCHOOLS, INC., a Delaware non-stock Corporation; CATHOLIC CEMETERIES, INC., a Delaware non-stock Corporation; SIENA HALL, INC., a Delaware non-stock Corporation; CHILDREN'S HOME, INC., a Delaware non-stock Corporation; SETON VILLA, INC., a Delaware non-stock Corporation; CATHOLIC YOUTH ORGANIZATION, INC., d/b/a CATHOLIC YOUTH MINISTRY, INC., a Delaware Corporation; ST. ANN'S ROMAN CATHOLIC CHURCH, a Delaware Corporation; ST. JOHN THE BELOVED ROMAN CATHOLIC CHURCH, a Delaware Corporation; HOLY SPIRIT ROMAN CATHOLIC CHURCH, a Delaware Corporation; ST. THOMAS THE APOSTLE ROMAN CATHOLIC CHURCH, a Delaware Corporation, ST. FRANCIS DE SALES ROMAN CATHOLIC CHURCH, a Maryland Corporation,<br><br>Defendants. | ) | Adv. Case No. ________________ |

**COMPLAINT FOR DECLARATORY**
**RELIEF AND SUBSTANTIVE CONSOLIDATION**

The Official Committee of Unsecured Creditors (the "Committee" or "Plaintiff") of the Catholic Diocese of Wilmington, Inc. (the "Debtor" or "Diocese") brings this action for declaratory and related relief against the defendants named herein, pursuant to 28 U.S.C. § 2201, for the purpose of, among other things, determining a question of actual controversy between the parties hereto. Plaintiff alleges as follows upon knowledge with respect to itself, and upon information and belief as to all other matters:

## INTRODUCTION

1. By this complaint, the Committee seeks, *inter alia*, a determination from the Court regarding ownership of more than $76 million in assets held by the Diocese in an investment account (the "Investment Account").

2. The Diocese contends that it holds the estimated $76 million in assets in trust for the benefit of the Parishes and certain other Non-Debtor Affiliates (as such terms are defined below). As a result, the Diocese contends that the estimated $76 million in assets purportedly held in trust are not part of the Diocese's estate, and thus cannot be reached by creditors of the Diocese, including the abuse survivors comprising the Committee's constituency.

3. As set forth below, the Committee contends that the Diocese has failed to establish, and indeed cannot establish, that a valid trust exists with respect to the estimated $76 million in the Investment Account. In particular, the Diocese cannot establish that a valid trust was created with the requisite intent, that the legal and beneficial interests in the alleged trust are sufficiently separate, or that the funds allegedly held in trust can be adequately identified or "traced" by the Diocese, the Parishes or the Non-Debtor Affiliates after they were comingled with other non-trust funds of the Diocese.

4. Therefore, for the reasons set forth below, the Committee respectfully requests a judgment from this Court declaring that the Investment Account constitutes property of the Diocese's estate and substantively consolidating the Diocese, the Parishes and the Non-Debtor Affiliates.

**THE PARTIES**

5. Plaintiff is the duly appointed Committee of Unsecured Creditors in this chapter 11 case and is comprised of creditors who filed tort-based lawsuits against, *inter alia*, the Diocese based upon sexual abuse by a members of the clergy, a worker, a teacher, a volunteer, or other person or entity associated with or representing the Diocese and/or parishes, schools, or other Diocese-related institutions served by the Diocese.

6. On information and belief, the Diocese is a not for profit non-stock member corporation organized under the laws of the State of Delaware. The Diocese is the debtor in the above-captioned chapter 11 bankruptcy case and the legal entity through which the Bishop of the Diocese conducts the temporal affairs of the Roman Catholic Diocese of Wilmington. On information and belief, the Dioceses uses the "Roman Catholic Diocese of Wilmington" to refer to the juridic person of the Diocese under Canon law. The term Diocese used herein refers to both the secular legal entity and the juridic person. The Most Rev. W. Francis Malooly (the current Bishop of the Diocese and hereafter "Bishop Malooly") is the sole member and also the President of the Diocese. The Diocese has no board of directors or comparable governing body.

**THE PARISHES**

7. On information and belief, St. Ann Roman Catholic Church, also known as St. Ann's Parish and St. Ann's Church ("St. Ann's") is a Delaware corporation located in Wilmington, Delaware, which operates under the auspice of the Diocese. It is authorized to do business and is doing business in the State of Delaware as private religious institution, operating both a church and elementary school.

8. On information and belief, St. John the Beloved Roman Catholic Church, also known as St. John the Beloved Church and Roman Catholic Parish of St. John the Beloved ("St. John") is a Delaware corporation located in Wilmington, Delaware, which operates under the auspice of the Diocese. It is authorized to do business and is doing business in the State of Delaware as private religious institution, operating both a church and an elementary school.

9. On information and belief, Holy Spirit Roman Catholic Church, also known as Holy Spirit Catholic Church and Holy Sprit Parish ("Holy Spirit") is a Delaware corporation located in New Castle, Delaware, which operates under the auspices of the Diocese. It is authorized to do business and is doing business in the State of Delaware as a private religious institution, operating both a church and an elementary school.

10. On information and belief, St. Thomas the Apostle Roman Catholic Church, also known as St. Thomas the Apostle Church ("St. Thomas") is a Delaware Corporation located in Wilmington Delaware, which operates under the auspices of the Diocese. It is authorized to do business and is doing business in the State of Delaware as a private religious institution, operating both a church and an elementary school.

11. On information and belief, St. Francis de Sales Roman Catholic Church ("St Francis") is a Maryland corporation located in Salisbury, Maryland, which operates under the auspices of the Diocese. It is authorized to do business and is doing business in the State of Maryland as private religious institution, operating both a church and an elementary school.

12. The parishes identified above are collectively referred to herein as the Parishes. The controlling members of each Parish include Bishop Malooly, the Chancellor of the Diocese, and the Parish Priest Pastor who serves at the pleasure of the Bishop.

**OTHER DIOCESE-AFFILIATED ENTITIES**

13. On information and belief, one of the primary vehicles used by the Bishop to govern the Diocese is the Curia, also known as the Diocesan Central Offices and Ministries (the "Diocesan Curia"). The Diocesan Curia is organized into six functional departments: Pastoral Services, Development, Finance, Communications, Catholic Education, and Catholic Charities. Each of these departments comprises a number of related agencies, ministries or administrative offices.

14. On information and belief, Catholic Diocese Foundation ("Foundation") f/k/a the Catholic Foundation of the Diocese of Wilmington, Inc. is a Delaware non-stock corporation and agent of the Diocese, having eleven members, one of whom is the Bishop. Of the remaining members of Foundation, five must be Diocesan priests who are nominated by the Bishop and five must be lay parishioners within the Diocese. The members of Foundation constitute its board of directors ("Foundation Board"), which elects all members of Foundation except the Bishop for four-year terms. The members of Foundation, except the Bishop, are

subject to a two-term limitation, provided, however, that the Bishop may exempt two other members from the two-term limitation. Each member has one vote as a director of Foundation. The current membership of Foundation is as follows: President: Bishop Malooly (who is also the sole member, Bishop and President of the Diocese) (ii) Secretary and Treasurer: Rev. Msgr. J. Thomas Cini (who is also the Secretary and Vicar General of the Diocese) ("Monsignor Cini"); and (iii) Members: Rev. Joseph Drobinski; Rev. Norman Carroll; Deacon Pete Nellius; William Kirk; Vy. Rev. George Brubaker; Susan D' Alonzo Ament, Esq.; Rev. Msgr. Ralph Martin; and Gordon Kaiser. There is currently one vacant member position. The Executive Director of Foundation (which is a nonmember employee position) is Joseph P. Corsini ("Mr. Corsini"), who is also the Treasurer and Chief Financial Officer of the Diocese.

15. On information and belief, the Diocese of Wilmington Schools, Inc. ("DOW Schools") is a Delaware non-stock member corporation and an agent of the Diocese assisting with Catholic education. In the hierarchal organizational structure of the Diocese, Dow Schools is an agency and/or a ministry within the Catholic Education Department of the Diocesan Curia. DOW Schools' members constitute its board of trustees. The Bishop is on the board of trustees and is entitled to appoint the other trustees, up to a maximum of seven including himself. The trustees of DOW Schools serve at the pleasure of the Bishop. The Bishop also serves as DOW Schools' president, while other officers are elected by the board of trustees from its members, all of whom have been appointed by the Bishop. The current membership of DOW Schools' board of trustees is as follows: (i) President: Bishop Malooly; (ii) Vice President: Monsignor Cini; (iii) Secretary: Catherine P. Weaver; (iv) Treasurer: Mr.

Corsini; and (v) Member: Rev. Msgr. Joseph F. Rebman (who is also the Vice President of the Diocese, Vicar General for Pastoral Services, and counsel for the Diocese) ("Monsignor Rebman").

16. On information and belief, Catholic Cemeteries, Inc. ("Cemeteries") is a Delaware non-stock corporation and agent of the Diocese assisting the burial of the dead. In the hierarchal organizational structure of the Diocese, Cemeteries is an agency within the Pastoral Concerns Department of the Diocesan Curia. The members of Cemeteries constitute its governing body. The Bishop must at all times be a member and the President of Cemeteries. The Bishop is entitled to appoint up to seven additional members of Cemeteries, all of whom serve at the pleasure of the Bishop. The current membership of Cemeteries, as appointed by the Bishop, is as follows: (i) President: Bishop Malooly; (ii) Vice President: Monsignor Rebman; (iii) Secretary: Mark A. Christian; (iv) Treasurer: Mr. Corsini; (v) Assistant Secretary: Hon. Alfred R. Fraczkowski; and (vi) Member: Monsignor Cini.

17. On information and belief, Siena Hall, Inc. ("Siena Hall") was formerly a Delaware corporation, is no longer in existence and good standing under the laws of the State of Delaware and is an agent of the Diocese. In the hierarchal organizational structure of the Diocese, Siena Hall is a agency and/or ministry within the Catholic Charities Department of the Diocesan Curia. Siena Hall's members constitute its board of trustees. The Bishop is on the board of trustees and is entitled to appoint the other trustees, up to a maximum of eight including himself. The trustees of Siena Hall serve at the pleasure of the Bishop. The Bishop also serves as Siena Hall's president, while other officers are elected by the board of trustees from its

members, all of whom have been appointed by the Bishop. The current membership of Siena Hall's board of trustees, as appointed by the Bishop, is as follows: (i) President: Bishop Malooly; (ii) Vice President: Raymond Manza; (iii) Secretary: Richelle Vible; (iv) Treasurer: Mr. Corsini; and (v) Members: Monsignor Cini and Monsignor Rebman. Siena Hall is in the process of being dissolved by the Diocese, with its assets transferred to Catholic Charities, Inc. ("Charities").

18. On information and belief, Children's Home, Inc. ("Children's Home") was formerly a Delaware corporation, is no longer in existence and good standing under the laws of the State of Delaware and is an agent of the Diocese. In the hierarchal organizational structure of the Diocese, Children's Home is an agency and/or ministry within the Catholic Charities Department of the Diocesan Curia. Children's Home's members constitute its board of trustees. The Bishop is on the board of trustees and is entitled to appoint the other trustees, up to a maximum of eight including himself. The trustees of Children's Home serve at the pleasure of the Bishop. The Bishop also serves as Children's Home's president, while other officers are elected by the board of trustees from its members, all of whom have been appointed by the Bishop. The current membership of Children's Home's board of trustees, as appointed by the Bishop, is as follows: (i) President: Bishop Malooly; (ii) Vice President: Raymond Manza; (iii) Secretary: Richelle Vible; (iv) Treasurer: Mr. Corsini; and (v) Members: Monsignor Cini and Monsignor Rebman. Children's Home is in the process of being dissolved by the Diocese, with its assets transferred to Charities.

19. On information and belief, Seton Villa, Inc. ("Seton Villa") was formerly a Delaware Corporation, is no longer in existence and good standing under the laws of the State of Delaware and is an agent of the Diocese. In the hierarchal organizational structure of the Diocese, Seton Villa is an agency and/or ministry within the Catholic Charities Department of the Diocesan Curia. Seton Villa's members constitute its board of trustees. The Bishop is on the board of trustees and is entitled to appoint the other trustees, up to a maximum of eight including himself. The trustees of Seton Villa serve at the pleasure of the Bishop. The Bishop also serves as Seton Villa's president, while other officers are elected by the board of trustees from its members, all of whom have been appointed by the Bishop. The current membership of Seton Villa's board of trustees, as appointed by the Bishop, is as follows: (i) President: Bishop Malooly; (ii) Vice President: Raymond Manza; (iii) Secretary: Richelle Vible; (iv) Treasurer: Mr. Corsini; and (v) Members: Monsignor Cini and Monsignor Rebman.

20. On information and belief, Catholic Youth Organization, Inc. d/b/a Catholic Youth Ministry, Inc. ("Catholic Youth") is a Delaware corporation and agent of the Diocese. In the hierarchal organizational structure of the Diocese, Catholic Youth is an agency and/or ministry within the Catholic Education Department of the Diocesan Curia. The current membership of Catholic Youth's board of trustees is as follows: (i) President: Bishop Malooly; (ii) Vice President: Monsignor Cini; (iii) Secretary: Patrick Donovan; and (iv) Treasurer: Mr. Corsini.

21. Foundation, Dow Schools, Cemeteries, Siena Hall, Children's Home, Seton Villa and Catholic Youth are collectively referred to herein as the "Non-Debtor Affiliates".

## JURISDICTION AND VENUE

22.     The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334(b).

23.     This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (O).

24.     Venue is proper in this Court pursuant to 28 U.S.C. § 1409(a) because this adversary proceeding is a core proceeding arising in the Diocese's chapter 11 case pending in this Court.

## FACTUAL BACKGROUND

25.     On October 18, 2009 (the "Petition Date"), the Diocese commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  The Diocese is authorized to continue to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

26.     The Diocese's commencement of the above-captioned bankruptcy case as of the Petition Date created an "estate" as defined in 11 U.S.C. § 541(a).

27.     On information and belief, the Diocese sought relief under chapter 11 of the Bankruptcy Code in response to multiple sexual abuse actions filed by the victims of such abuse, in order to obtain leverage over the victims and to hide financial resources owned and controlled by the Diocese from the victims.

**A. <u>The Diocese Dominates and Controls the Parishes and the Non-Debtor Affiliates</u>**

28. The Diocese exercises complete control and domination over the Parishes and Non-Debtor Affiliates, such that the Parishes and Non-Debtor Affiliates are mere instrumentalities, agents and/or alter egos of the Diocese that have no legal existence separate and distinct from the Diocese.

29. With respect to the Parishes, on information and belief, the Bishop (who is also the sole member and President of the Diocese) and the Chancellor of the Diocese are members of each Parish Corporation. The Bishop appoints the pastor of each of the Parishes. Each pastor so appointed by the Bishop is the president and treasurer of his respective Parish. Each pastor serves at the pleasure of the Bishop, owes a duty of obedience to the Bishop and is the agent of the Bishop in his respective Parish

30. Only the Bishop has the power to dissolve any of the Parishes or establish new ones.

31. The Diocese has adopted statutes requiring parish pastors to obtain the Bishop's approval in order to (i) incur debt, (ii) make an extraordinary expenditure greater than $25,000, (iii) sell hard assets such as real property, and (iv) enter into a contract to acquire real property or to undertake other significant obligations. In addition, the Parishes are required to follow accounting procedures promulgated by the Diocese and to file budgets and annual reports with the Diocese.

32. The Bishop also has the authority to "suppress" any parish in the Diocese. On information and belief, upon suppression of a Parish, either the assets of the suppressed

Parish are transferred to another Parishes in the Diocese, or the Diocese itself succeeds to the

assets of the suppressed Parish. Further, if a Parish elects to leave or otherwise disassociate itself

from the Diocese, it is not entitled to any of the Parish assets which instead belong to the

Diocese.

33.     With respect to the Non-Debtor Affiliates, the Diocese exercises complete

day to day operational and financial control and domination through the Bishop (the sole

member and President of the Diocese), Monsignor Cini (Secretary of the Diocese, Vicar General

of Administration and Moderator of the Curia for the Diocese), Mr. Corsini (Treasurer and Chief

Financial Officer of the Diocese) and Monsignor Rebman (Vice President of the Diocese, Vicar

General for Pastoral Services, and counsel for the Diocese ).  As set forth above, the Bishop is a

member and the President of each of the Non-Debtor Affiliates.  Monsignor Cini is a member of

the Foundation Board, and is a member of each of the other Non-Debtor Affiliates.  Mr. Corsini

is the Executive Director of Foundation, and is a member of each of the other Non-Debtor

Affiliates.  Monsignor Rebman is not a member of the Foundation Board, but is a member of

each of the other Non-Debtor Affiliates except Catholic Youth.

34.     On information and belief, Siena Hall, Children's Home and Seton Villa

also share an advisory board of directors, whose members serve at the pleasure of the Bishop.

35.     On information and belief, the Parishes and Non-Debtor Affiliates are

each subject to the statutes and regulations of the Diocese.

36.     As a result of the complete day to day operational and financial control

and domination exercised by the Diocese over the Parishes and Non-Debtor Affiliates, the

Parishes and the Non-Debtor Affiliates have failed, on information and belief, to observe proper corporate formalities and have not dealt with each other at arms length.  Moreover, on information and belief, the Diocese, through the exercise of its complete operational and financial control and domination, has caused the Parishes and the Non-Debtor Affiliates to transfer property to the Diocese and each other for either no or only nominal consideration.  On numerous occasions, the Diocese has caused the transfer of property to the Parishes and/or the Non-Debtor Affiliates for nominal or no consideration.

37.     On information and belief, the financial affairs of the Diocese, the Parishes and the Non-Debtor Affiliates are inextricably intertwined and interdependent.

38.     On information and belief, the Diocese raises money through an annual appeal and uses the funds raised to support the Parishes and the Non-Debtor Affiliates.

39.     On information and belief, the Diocese and Foundation subsidize the operations of the Parishes and Non-Debtor Affiliates.

40.     On information and belief, Foundation routinely provides financial support to the Diocese to offset the costs of lawsuits and other claims against the Diocese and the Diocese pays the legal fees of the Parishes.

41.     The Parishes also provide funding to the Diocese through parish assessments, which are used to fund the general operations of the Diocese.

42.     As discussed further below, most of the investment funds of the Parishes and the Non-Debtor Affiliates are held in the Investment Account owned by the Diocese.

43.     On information and belief, consolidated financial statements are prepared for Siena Hall, Children's Home and Seton Villa.

44.     On information and belief, only the Bishop has the power to authorize the opening or closing of schools.

45.     The business operations of the Diocese, the Parishes and the Non-Debtor Affiliates also are inextricably intertwined and interdependent.  In particular, the Diocese provides centralized operational support for the Parishes and the Non-Debtor Affiliates.

46.     For instance, on information and belief, the Diocese provides payroll processing services for the Parishes and the Non-Debtor Affiliates other than Cemeteries.  On information and belief, all employees of the Parishes and the Non-Debtor Affiliates are paid from a payroll account owned and maintained by the Diocese.

47.     On information and belief, employees of the Parishes and Non-Debtor Affiliates must comply with the personnel policies and procedures of the Diocese.

48.     On information and belief, the Diocese provides health insurance and workers compensation insurance for the employees of the Diocese, the Parishes and the Non-Debtor Affiliates.

49.     On information and belief, the Diocese sponsors a pension plan for the lay employees of the Diocese, the Parishes and the Non-Debtor Affiliates.  The Diocese makes all contributions to the pension plan and no contributions to the plan are made by the Parishes or the Non-Debtor Affiliates.

50. On information and belief, the Diocese provides a pension plan for retired priests. No contributions to this plan are made by the Parishes.

51. Finally, the Diocese, the Parishes and the Non-Debtor Affiliates hold themselves out to the public as a single, unified organization.

52. On information and belief, the Diocese, the Parishes and the Non-Debtor Affiliates use the Diocese's name to refer to the Parishes and the Non-Debtor Affiliates.

53. For instance, on the Diocese's website at http://www.cdow.org.html (the "Diocese Website"), the Diocese lists the Parishes, Cemeteries, Catholic Youth and DOW Schools as part of the Diocese. The Diocese Website contains numerous statements by which the Diocese held itself, the Parishes and the Non-Debtor Affiliates out to the public as one unified organization.

54. On information and belief, the Non-Debtor Affiliates do not have their own websites separate from the Diocese Website.

55. Email addresses for individuals purportedly employed or affiliated with the Non-Debtor Affiliates go through the Diocese server.

56. On information and belief, the Diocese and some or all of the Non-Debtor Affiliates occupy the same premises and use the same business locations.

## B. The Diocese owns and controls all funds in the Investment Account

57. The Diocese owns the Investment Account maintained by the Bank of New York Mellon f/k/a Mellon Bank (the "Custodian"). The Investment Account is governed by that certain Custody Agreement by and between the Diocese and the Custodian dated as of

July 23, 1999 (the “Custody Agreement”). A true and accurate copy of the Custody Agreement is attached hereto as **Exhibit A.**

58. In the Diocese’s Motion for (I) Interim and Final Orders (A) Authorizing the Debtor to Use its Pooled Investment Account and Process Withdrawal Requests from Non-Debtor Pooled Investors in the Ordinary Course, (B)Waiving Section 345 Deposit Guidelines, (C) Scheduling a Final Hearing, and (D) Granting Related Relief; and (II) A Final Order Authorizing the Debtor to Take All Actions Necessary or Appropriate to Transfer Possession of Pooled Investment Funds to One or More Non-Debtor Fiduciaries (the “Motion”), the Diocese contends that the Diocese, St Ann’s, St John, Holy Spirit, St. Francis and the Non-Debtor Affiliates participate in a deposit system (the “Pooled Investment Program”) whereby certain funds from the Pooled Investors (the “Pooled Investment Funds”) are deposited in the Diocese’s general operating account (“Operating Account”), comingled with other funds of the Diocese and subsequently transferred to the Investment Account for investment purposes. The Committee is informed and believes that St. Thomas also participates in the Pooled Investment Program. The participants in the Pooled Investment Program are sometimes referred to herein as the “Pooled Investors”.

59. On information and belief, the Diocese and/or the Diocesan Finance Counsel controls the investment decisions for the Non-Debtor Affiliates, including without limitation, the amounts invested into the Investment Account and the investment decisions.

60. According to the Motion, the Diocese selects an approved list of investment managers from among the universe of potential managers. The approved managers

make investments that are consistent with socially responsible investment guidelines promulgated by the United States Conference of Catholic Bishops (the "USCCB") and that are acceptable to the Bishop.

61.     In the Motion, the Diocese contends that it acts as a clearinghouse for deposits into and withdrawals from the Investment Account, which is accounted for as sub-accounts by the Diocese and the Custodian, with separate account numbers for (i) each of the approved third-party investment managers with which investment vehicles are deposited and (ii) each of the Pooled Investors' various sub-funds.

62.     In the Motion, the Diocese contends that it is responsible for accounting for transactions regarding the Investment Account and the Custodian is responsible for allocating interest, gains, losses, and fees associated with the various investment vehicles across the various sub-funds.

63.     In the Motion, the Diocese contends that contributions to or withdrawals from the Investment Account are generally memorialized through written communications to the Diocese, which are accompanied by a wire transfer or check, if applicable.

64.     On information and belief, in order to make a contribution to the Investment Account, the non-debtor Pooled Investors deposit funds into the Diocese's operating account ("Operating Account"). After the funds are deposited in the Operating Account and commingled with other funds of the Diocese, funds from the Operating Account are transferred to the Investment Account.

65.    On information and belief, the funds deposited into the Investment Account via the Diocese's Operating Account cannot  be traced since the funds were commingled with the Diocese's other funds.

66.    The Diocese contends that the Diocese, the Parishes and the Non-Debtor Affiliates understood and intended that certain of the funds in the Investment Account were held in trust by the Diocese for the benefit of the Parishes and the Non-Debtor Affiliates..

67.    In the Motion, the Diocese contends that as of September 30, 2009, the aggregate value of the assets of the Diocese in the Investment Account was approximately $44,200,000, the aggregate value of the assets of the Foundation in Investment Account was approximately $43,200,000 and the aggregate value of the assets of the Non-Debtor Affiliates (other than Foundation, but including Charities which is not a defendant herein) in the Investment Account was approximately $27,600,000.  The Committee is informed and believes that the aggregate value of the assets of the Parishes in the Investment Account exceeds $3,000,000.

68.    On information and belief, neither the Diocese nor the Parishes and Non-Debtor Affiliates understood or intended that any funds in the Investment Account were to be held in trust by the Diocese for the benefit of the Parishes and Non-Debtor Affiliates.  The Investment Account is in fact owned by the Diocese and is under its complete control and domination, and none of the assets in the Investment Account are held in trust for the Parishes and Non-Debtor Affiliates.

**FIRST CLAIM FOR RELIEF**

**(Alter Ego: The Diocese, Parishes and the Non-Debtor Affiliates constitute a single entity)**

69. The Committee repeats and realleges the allegations of paragraphs 1 through 68 above as if fully set forth herein.

70. Through the Bishop and with the assistance of other high-level management personnel of the Diocese including Monsignor Cini, Mr. Corsini and Monsignor Rebman, the Diocese exercised such a high degree of domination and control over the Parishes and the Non-Debtor Affiliates, that the Parishes and Non-Debtor Affiliates had no separate existence but rather operated as a single entity and enterprise.

71. The Parishes and Non-Debtor Affiliates are mere instrumentalities, agents and/or alter egos of the Diocese that have no legal existence separate and distinct from the Diocese.

72. The Diocese is attempting to use its bankruptcy filing to obtain a litigation advantage over its abuse victims and to place assets it owns and controls beyond the reach of the abuse victims.

73. Under these circumstances, it would be unfair and inequitable to treat the Parishes and the Non-Debtor Affiliates as separate entities. Disregarding the alleged corporate separateness of the Parishes and the Non-Debtor Affiliates is necessary to avoid the gross injustice and unfairness that would result to the abuse victims if the Diocese were permitted to remove the bulk of the assets in the Investment Account from its bankruptcy estate and place those assets beyond the reach of its abuse victims and other creditors of the Diocese.

74. Wherefore, the Committee respectfully prays for a judgment declaring that the Parishes and Non-Debtor Affiliates are mere instrumentalities agents and/or alter egos of the Diocese and that the Diocese, the Parishes and the Non-Debtor Affiliates are a single legal entity.

**SECOND CLAIM FOR RELIEF**

**(Declaratory Relief: No valid trust exists with respect to the Investment Account)**

75. The Committee repeats and realleges the allegations of paragraphs 1 through 74 above as if fully set forth herein.

76. The Diocese, the Parishes and the Non-Debtor Affiliates contend that the funds in the Investment Account, or a substantial portion thereof, is held in either an express or resulting trust by the Diocese for the benefit of the Parishes and the Non-Debtor Affiliates. The Diocese, the Parishes and the Non-Debtor Affiliates further contend that the funds allegedly held in trust do not constitute property of the Diocese's estate.

77. Plaintiff, on the other hand, contends that no valid trust exists with respect to any of the assets held by the Diocese in the Investment Account. Plaintiff contends that neither the Diocese nor the non-debtor Pooled Investors understood or intended that any funds in the Investment Account were to be held in trust by the Diocese for the benefit of the non-debtor Pooled Investors. Plaintiff further contends that both the legal and beneficial interest in the Investment Account, and all of the funds and assets therein, are property of the Diocese's estate, free and clear of the interests of any other person or entity.

78. An actual, justiciable controversy exists as to whether the Investment Account, and all of the funds and assets therein, are (as the Diocese, the Parishes and the Non-

Debtor Affiliates contend) held in trust by the Diocese for the benefit of the Parishes and the Non-Debtor Affiliates or are (as the Plaintiff contends) owned by the Diocese and constitute property of the Diocese's estate.

79. Wherefore, the Committee respectfully prays for a judgment declaring that the Investment Account is not held in trust by the Diocese for the benefit of the Parishes and the Non-Debtor Affiliates, and that the Investment Account, and all of the funds and assets therein, constitutes property of the Diocese's estate.

**<u>THIRD CLAIM FOR RELIEF</u>**

**(Declaratory Relief: Diocese owns all legal and equitable interest in the Investment Account)**

80. The Committee repeats and realleges the allegations of each of paragraphs 1 through 79 above as if fully set forth herein.

81. Under the doctrine of merger, a valid trust cannot exist where the legal interest in the alleged trust assets and the beneficial interest in the alleged trust assets are held by the same entity.

82. As set forth above, the Committee alleges that the Diocese, the Parishes and the Non-Debtor Affiliates constitute a single legal entity. Therefore, the legal interest in the alleged trust assets (purportedly held by the Diocese) and the beneficial interest in the alleged trust assets (purportedly held by the Parishes and the Non-Debtor Affiliates) are identical and held by the same legal entity. As a result, no express or resulting trust as alleged by the Diocese can exist with respect to the assets in the Investment Account.

83. The Diocese, Parishes and the Non-Debtor Affiliates contend that the Parishes and Non-Debtor Affiliates are separate from the Diocese, and that the Diocese holds the bulk of the assets in the Investment Account in trust for the Parishes and Non-Debtor Affiliates.

84. An actual, justiciable controversy exists as to whether the legal and beneficial interest in the alleged trust is held by the same legal entity, such that the alleged trust is void.

85. Wherefore, the Committee respectfully prays for a judgment declaring that the assets in the Investment Account are not held in trust by the Diocese for the benefit of the Parishes and the Non-Debtor Affiliates, and that the Investment Account, and all of the funds and assets therein, constitutes property of the Diocese's estate.

**FOURTH CLAIM FOR RELIEF**

**(Declaratory Relief: Funds deposited into the Diocese's Operating Account are untraceable)**

86. The Committee repeats and realleges the allegations of each of paragraphs 1 through 85 above as if fully set forth herein.

87. The Diocese, Parishes and Non-Debtor Affiliates contend that they can trace the funds deposited into the Diocese's Operating Account, and comingled with non-trust funds, into the Investment Account.

88. The Committee contends that the funds allegedly deposited by the Parishes and the Non-Debtor Affiliates into the Diocese's Operating Account and comingled with other non-trust funds of the Diocese cannot be adequately traced into the Investment

Account. Therefore, even if an express or resulting trust is found to exist, the Investment Account, and all of the funds and assets therein, constitutes property of the Diocese's estate.

89. An actual, justiciable controversy exists as to whether the Diocese, Parishes and Non-Debtor Affiliates can meet their burden to prove that the funds deposited into the Diocese's Operating Account, and comingled with the Diocese non-trust funds, can be traced to the assets in the Investment Account.

90. Wherefore, the Committee respectfully prays for a judgment declaring that that the Investment Account, and all of the funds and assets therein, constitutes property of the Diocese's estate.

## FIFTH CLAIM FOR RELIEF

### (Declaratory Relief: Substantive Consolidation)

91. The Committee repeats and realleges the allegations of paragraphs 1 through 90 above as if fully set forth herein.

92. Prior to the Petition Date, the constituents represented by the Committee dealt with the Diocese, the Parishes and the Non-Debtor Affiliates as a single institution.

93. Upon information and belief, the Committee alleges that the Parishes and Non-Debtor Affiliates are mere instrumentalities of the Diocese, with no separate existence apart from the Diocese. Upon information and belief, the Committee alleges that separateness of these entities was disregarded so significantly prior to the Petition Date, that creditors relied on the breakdown of entity borders and treated them as one legal entity.

94.     Moreover, upon information and belief, the Committee alleges that after the Petition Date, the assets and liabilities of the Diocese, the Parishes and the Non-Debtor Affiliates are so scrambled that separating them is prohibitive and hurts all creditors.

95.     Upon information and belief, substantive consolidation will allow a truly equitable distribution of assets among the Diocese's creditors by treating the Diocese, the Parishes and the Non-Debtor Affiliates as a single economic unit.

96.     An actual, justiciable controversy exists as to whether substantive consolidation of the Diocese, the Parishes and the Non-Debtor Affiliates is appropriate .

97.     Therefore, the Committee respectfully seeks a judgment of this Court ordering substantive consolidation of the Diocese's estate with the Parishes and the Non-Debtor Affiliates.

**WHEREFORE**, the Committee prays for judgment as follows:

1.     Declaring that the Parishes and Non-Debtor Affiliates are mere instrumentalities, agents and/or alter egos of the Diocese and have no legal identities separate from the Diocese.

2.     Declaring that the Investment Account, and the funds and assets therein, are not held by the Diocese in either an express or resulting trust and that the Investment Account, and all of the funds and assets therein, constitutes property of the Diocese's estate under 11 U.S.C. § 541(a)(1).

3.     Declaring that any express or resulting trust that may have been created with respect to the Investment Account is void under the doctrine of merger because the same

legal entity holds an identical legal and beneficial interest in the alleged trust assets, and

therefore that the Investment Account, and all of the funds and assets therein, constitutes

property of the Diocese's estate under 11 U.S.C. § 541(a)(1).

4.      Declaring that the Parishes and Non-Debtor Affiliates cannot meet their

burden to trace cash allegedly deposited into the Diocese's Operating Account and comingled

with other funds to the assets in the Investment Account, and therefore that the Investment

Account, and all of the funds and assets therein, constitutes property of the Diocese's estate

under 11 U.S.C. § 541(a)(1).

5.      Ordering substantive consolidation of the Diocese's bankruptcy estate

with the Parishes and the Non-Debtor Affiliates.

6.      Granting such other and further relief as is just and proper.


Dated:    December 18, 2009            PACHULSKI STANG ZIEHL & JONES LLP


                                        */s/ Mark M. Billion*
                                        Laura Davis Jones (DE Bar No. 2436)
                                        James I. Stang (CA Bar 94435)
                                        Kenneth H. Brown (CA Bar 100396)
                                        Curtis A. Hehn (DE Bar No. 4264)
                                        Gillian N. Brown (CA Bar. 205132)
                                        Mark M. Billion (DE Bar No. 5263)
                                        919 North Market Street, 17th Floor
                                        Wilmington, DE  19899-8705
                                        Telephone: 302/652-4100
                                        Facsimile:  302/652-4400
                                        E-mail: ljones@pszjlaw.com
                                                jstang@pszjlaw.com
                                                kbrown@pszjlaw.com
                                                chehn@pszjlaw.com
                                                gbrown@pszjlaw.com
                                                ewagner@pszjlaw.com

                                        Counsel for the Official Committee of Unsecured Creditors

# EXHIBIT A

Bill Nee
40555

# CUSTODY AGREEMENT

**THIS CUSTODY AGREEMENT** made as of July 23, 1999, ("Agreement") by and between **THE CATHOLIC DIOCESE OF WILMINGTON, INC.**, a Corporation organized under the laws of Delaware ("Client"), and **MELLON BANK, N.A.**, a national banking association organized under the laws of the United States, ("Custodian").

**WITNESSETH:**

**WHEREAS**, the Client and the Custodian desire to establish a custody account to provide for the safekeeping and recordkeeping of certain property of the Client;

**NOW, THEREFORE**, the Client and the Custodian, each intending to be legally bound, agree as follows:

1. **Establishment of/Additions to Account**. The Client hereby appoints **MELLON BANK, N.A.** as Custodian for any property acceptable to the Custodian which the Client may deposit to the Custodian's care ("Account"). The Custodian shall have no responsibility for any property until it in fact is received by the Custodian or its agents or subcustodians. "Property" as used herein shall not include any direct interest in real property, leaseholds or mineral interests.

2. **Distributions**. The Custodian shall make distributions or transfers out of the Account pursuant to Authorized Instructions, as defined below. In making payments to service providers pursuant to Authorized Instructions, the Client acknowledges that the Custodian is acting as a paying agent, and not as the payor, for tax information reporting and withholding purposes.

3. **Authorized Parties**. The Client shall furnish the Custodian with a written list of the names and signatures of all persons authorized to direct the Custodian on behalf of the Client under the terms of this Agreement. In addition, the Client may appoint and remove one or more investment managers ("Investment Manager") for such portion of the Account as the Client shall designate to the Custodian in writing. The Investment Manager shall furnish the Custodian with a written list of the names and signatures of the person or persons who are authorized to represent the Investment Manager in dealings with the Custodian. The Custodian shall be entitled to deal with any person or entity so identified by the Client or Investment Manager ("Authorized Party or Authorized Parties") until notified otherwise in writing. The Custodian shall be under no duty to question any direction of an Authorized Party with respect to the portion of the Account over which such Authorized Party has authority, to review any property held in the Account, to make

**EXHIBIT A**

any suggestions with respect to the investment and reinvestment of the assets in the Account, or to evaluate or question the performance of any Authorized Party and the Custodian shall not be responsible or liable for any diminution of value of any securities or other property held by the Custodian (or its subcustodians).

4. **Authorized Instructions.** All directions and instructions to the Custodian from an Authorized Party shall be in writing, by facsimile transmission, electronic transmission, or any other method specifically agreed to in writing by the Client and the Custodian, provided the Custodian may, in its discretion, accept oral directions and instructions and may require confirmation in writing. The Custodian shall be fully protected in acting in accordance with all such directions and instructions ("Authorized Instructions") which it reasonably believes to have been given by an Authorized Party or in failing to act in the absence thereof.

5. **Directed Powers of Custodian.** The Custodian shall have and exercise the following powers and authority in the administration of the Account upon the direction of an Authorized Party:

a. Settle purchases and sales and engage in other transactions, including free receipts and deliveries, exchanges and other voluntary corporate actions, with respect to securities or other property received by the Custodian;

b. Execute proxies for any stocks, bonds or other securities held in the Account;

c. Lend the assets of the Account in accordance with the terms and conditions of a separate securities lending agreement; and

d. Take any and all actions necessary to settle transactions in futures and/or options contracts, short-selling programs, foreign exchange or foreign exchange contracts, swaps and other derivative investments.

Settlements of transactions may be effected in trading and processing practices customary in the jurisdiction or market where the transaction occurs. The Client acknowledges that this may, in certain circumstances, require the delivery of cash or securities (or other property) without the concurrent receipt of securities (or other property) or cash and, in such circumstances, the Client shall have responsibility for nondelivery of securities or other property (or late delivery) or nonreceipt of payment (or late payment) by the counterparty.

6. **Discretionary Powers of Custodian.** The Custodian shall have and exercise the following powers and authority in the administration of the Account:

a. Appoint sub-custodians (including a corporate affiliate of the Custodian) domestic or foreign, as to part or all of the Account;

b.      Hold property in nominee name, in bearer form or in book entry form in a clearinghouse corporation or in a depository, so long as the Custodian's records clearly indicate that the assets held are a part of the Account;

c.      Commence or defend suits or legal proceedings and represent the Account in all suits or legal proceedings in any court or before any other body or tribunal as the Custodian shall deem necessary to protect the Account;

d.      Employ suitable agents and legal counsel, who may be counsel for the Client, and, as a part of its reimbursable expenses under this Agreement, pay their reasonable compensation and expenses. The Custodian shall be entitled to rely on and may act upon advice of counsel on all matters, and shall be without liability for any action reasonably taken or omitted pursuant to such advice;

e.      Take all action necessary to pay for authorized transactions, including exercising the power to borrow or raise monies from the Custodian in its corporate capacity or an affiliate of the Custodian and shall hold any property in the Account as security for advances made to the Account for any such authorized transactions, including disbursements or expenses, or the purchase or sale of foreign exchange, or of contracts for foreign exchange. The Custodian shall be entitled to collect from the Account sufficient cash for reimbursement and, if such cash is insufficient, dispose of assets of the Account to the extent necessary to obtain reimbursement;

f.      Make, execute and deliver any and all documents, agreements or other instruments in writing as is necessary or desirable for the accomplishment of any of the powers in this Agreement; and

g.      Generally take all action, whether or not expressly authorized, which the Custodian may deem necessary or desirable for the fulfillment of its duties hereunder.

The powers described in this Section 6 may be exercised by the Custodian with or without Authorized Instructions, but where the Custodian acts on Authorized Instructions, the Custodian shall be fully protected as described in Section 4. Without limiting the generality of the foregoing, the Custodian shall not be liable for the acts or omissions of any subcustodian appointed under paragraph (a) of this Section 6 pursuant to Authorized Instructions including, but not limited to, any broker-dealer or other entity designated by Client or Investment Manager to hold any property of the Account as collateral or otherwise pursuant to investment strategy.

7.      **Duties of Custodian.** The Custodian shall perform or cause its agents or subcustodians to perform the following duties with respect to the Account:

a.      Hold the property in safekeeping facilities of the Custodian or of other custodian banks or clearing corporations, in the United States or elsewhere; provided that the Custodian shall not be responsible for any losses resulting from the deposit or maintenance of securities or other property (in accordance with market practice, custom, or regulation) with any

recognized foreign or domestic clearing facility, book-entry system, centralized custodial depository, or similar organization;

b. Collect all income payable to and all distributions due to the Account and sign on the Account's behalf all declarations, affidavits, and certificates of ownership required to collect income and principal payments, provided that the Custodian shall not be responsible for the failure to receive payment of (or late payment of) distributions with respect to securities or other property held in the Account;

c. Subject to the timely receipt of notice from an issuer or Authorized Party, collect all proceeds from securities, certificates of deposit or other investments which may mature or be called;

d. Submit or cause to be submitted to the Client or the Investment Manager, as designated by the Client, information actually received by the Custodian regarding ownership rights pertaining to property held in the Account;

e. Attend to involuntary corporate actions;

f. Determine the fair market value of the Account as of such dates as the Client and the Custodian may agree upon, in accordance with methods consistently followed and uniformly applied. In determining fair market value of the Account, the Custodian shall be protected in relying on values recommended by an Authorized Party; and

g. Render periodic statements for property held hereunder.

8. **Contractual Income and Settlement.**

a. Contractual Income. The Custodian shall credit the Account with income and maturity proceeds on securities on contractual payment date net of any taxes or upon actual receipt as agreed between the Custodian and the Client. To the extent the Client and the Custodian have agreed to credit income on contractual payment date, the Custodian may reverse such accounting entries with back value to the contractual payment date if the Custodian reasonably believes that it will not receive such amount.

b. Contractual Settlement. The Custodian will attend to the settlement of securities transactions on the basis of either contractual settlement date accounting or actual settlement date accounting as agreed between the Client and the Custodian. To the extent the Client and the Custodian have agreed to settle certain securities transactions on the basis of contractual settlement date accounting, the Custodian may reverse with back value to the contractual settlement date any entry relating to such contractual settlement where the related transaction remains unsettled in accordance with established procedures.

9. Tax Law.

a. The Custodian shall use reasonable efforts to assist the Authorized Party, to the extent the Authorized Party has provided necessary information, with respect to any tax obligations, including responsibility for taxes, withholding, certification and reporting requirements, claims for exemptions or refund, interest, penalties and other expenses ("Tax Obligations"). The Client shall cause the Authorized Party to notify the Custodian in writing of any such Tax Obligations. The Custodian shall have no responsibility or liability for any Tax Obligations now or hereafter imposed on the Client or the Account by any taxing authorities, domestic or foreign.

b. To the extent the Custodian is responsible under any applicable law for any Tax Obligation, the Client shall cause the Authorized Party to inform the Custodian of all Tax Obligations, shall direct the Custodian with respect to the performance of such Tax Obligations and shall provide the Custodian with the necessary funds and all information required by the Custodian to meet such Tax Obligations.

10. Non-Account Assets. The Client may request the Custodian to perform a recordkeeping function with respect to property held by others and not otherwise subject to the terms of this Agreement. To the extent the Custodian shall agree to perform this service, its sole responsibility shall be to accurately reflect information on its books which it has received from an Authorized Party.

11. Reporting and Recordkeeping. If, within ninety (90) days after the Custodian mails to the Client a statement with respect to the Account, the Client has not given the Custodian written notice of any exception or objection thereto, the statement shall be deemed to have been approved, and in such case, the Custodian shall not be liable for any matters in such statements. The Client shall have the right, at its own expense and with prior written notice to the Custodian, to inspect the Custodian's books and records directly relating to the Account during normal business hours or to designate an accountant to make such inspection.

12. Standard of Care. In performing its duties under this Agreement, the Custodian shall exercise the same care and diligence that it would devote to its own property in like circumstances. The duties of the Custodian shall only be those specifically undertaken pursuant to this Agreement. The Custodian shall not be responsible or liable for any losses or damages suffered by the Client arising as a result of the insolvency of any subcustodian, except to the extent the Custodian was negligent in its selection or continued retention of such subcustodian.

The Custodian shall not be responsible for the title, validity or genuineness of any property or evidence of title thereto received by it or delivered by it pursuant to this Agreement and shall be held harmless in acting upon any notice, request, direction, instruction, consent, certification or other instrument believed by it to be genuine and delivered by an Authorized Party. The Custodian shall not be liable for any act or omission of any other person in carrying out any responsibility imposed upon such person and under no circumstances shall the Custodian

be liable for any indirect, consequential, or special damages with respect to its role as Custodian.

13. **Force Majeure.** Notwithstanding anything in this Agreement to the contrary contained herein, the Custodian shall not be responsible or liable for its failure to perform under this Agreement or for any losses to the Account resulting from any event beyond the reasonable control of the Custodian, its agents or subcustodians, including but not limited to nationalization, strikes, expropriation, devaluation, seizure, or similar action by any governmental authority, de facto or de jure; or enactment, promulgation, imposition or enforcement by any such governmental authority of currency restrictions, exchange controls, levies or other charges affecting the Account's property; or the breakdown, failure or malfunction of any utilities or telecommunications systems; or any order or regulation of any banking or securities industry including changes in market rules and market conditions affecting the execution or settlement of transactions; or acts of war, terrorism, insurrection or revolution; or acts of God; or any other similar event. This Section shall survive the termination of this Agreement.

14. **Compensation and Expenses.** The Custodian shall be entitled to compensation for services under this Agreement as mutually agreed. The Client acknowledges that, as part of the Custodian's compensation, the Custodian will earn interest on balances, including disbursement balances and balances arising from purchase and sale transactions. The Custodian shall also be entitled to reimbursement for reasonable expenses incurred by it in the discharge of its duties under this Agreement. The Custodian is authorized to charge and collect from the Account any and all fees and expenses earned unless such fees and expenses are paid directly by the Client. To the extent the Custodian advances funds to the Account for disbursements or to effect the settlement of purchase transactions, the Custodian shall be entitled to collect from the Account either (i) with respect to domestic assets, an amount equal to what would have been earned on the sums advanced (an amount approximating the "federal funds" interest rate) or (ii) with respect to non-domestic assets, the rate applicable to the appropriate foreign market.

15. **Indemnification.** The Client shall indemnify and hold harmless the Custodian from all liability and expense, including reasonable counsel fees and expenses, arising out of the performance of its obligations under this Agreement except as a result of the Custodian's own gross negligence or willful misconduct. This indemnification shall survive the termination of this Agreement.

16. **Amendment or Termination.** This Agreement may be amended by written agreement of the Client and the Custodian and may be terminated by either party upon ninety (90) days' notice in writing to the other party.

17. **Governing Law and Legal Proceedings.** This Agreement shall be construed in accordance with and governed by the laws of the Commonwealth of Pennsylvania. The parties hereby expressly waive, to the full extent permitted by applicable law, any right to trial by jury with respect to any judicial proceeding arising from or related to this Agreement.

18. **Representations.** The Client and the Custodian hereby each represent and

warrant to the other that it has full authority to enter into this Agreement upon the terms and conditions hereof and that the individual executing this Agreement on its behalf has the requisite authority to bind the Client or the Custodian to this Agreement.

19. Necessary Parties. All of the understandings, agreements, representations and warranties contained herein are solely for the benefit of the Client and the Custodian and there are no other parties who are intended to be benefited, in any way whatsoever, by this Agreement.

20. Execution in Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, and said counterparts shall constitute but one and the same instrument and may be sufficiently evidenced by one counterpart.

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date first set forth above.

**Authorized Signer of:**
**THE CATHOLIC DIOCESE OF WILMINGTON, INC.**

By: [signature]
Name: Joseph P. Corsini
Title: Chief Financial Officer

**Address for Notice:**
Catholic Diocese of Wilmington
1925 Delaware Ave
Wilmington DE 19806

**Taxable:** ______
**or**
**Tax Exempt:** X
**(Under IRC Section:** 501(c)(3)**)**

______
**Fiscal Year**

**Authorized Officer of:**
**MELLON BANK, N.A.**

By: [signature]
Name: WILLIAM J. McCABE
Title: VICE PRESIDENT

**Address for Notice:**
______
______
______

5/17/99:1000023\catdiocu.doc

## TAXPAYER IDENTIFICATION NUMBER CERTIFICATION

By signing below the Client hereby certifies under penalties of perjury that the taxpayer identification number provided below is correct and that the Client is not subject to back-up withholding on reportable payments credited to the Client's Account by the Custodian. The Client may not be subject to back-up withholding either because (a) the Client is exempt from back-up withholding because it is an "exempt recipient," (b) the Client has not been notified by the Internal Revenue Service that it is subject to back-up withholding for failure to report all interest or dividends, or (c) the IRS has notified the Client that it is no longer subject to back-up withholding. (If (a), (b), or (c) do not apply, please cross out.) **Failure to sign below and provide a valid taxpayer identification number may require that the Custodian apply federal income tax withholding at the rate of 31% (or the rate as required by law) on all reportable payments made to the Account established under this Agreement.**

**The Internal Revenue Service does not require your consent to any provision of this document other than the certifications required to avoid backup withholding.**

**THE CATHOLIC DIOCESE OF WILMINGTON, INC.**

**By:** [signature]
**Name:** Joseph P. Corsini
**Title:** Chief Financial Officer

51 - 0095439
**Taxpayer Identification Number**